**Joseph A. MARSAGLIA, Jr., Plaintiff,**

v.

**L. BEINHAUER & SON, CO., Defendant.**

No. CIV.A. 95–1131.

United States District Court,
W.D. Pennsylvania.

Dec. 2, 1997.

James B. Lieber, Lieber & Hammer, Pittsburgh, PA.

Carole S. Katz, Reed Smith Shaw & McClay, Pittsburgh, PA.

*MEMORANDUM OPINION*

CINDRICH, District Judge.

In this action based on employment discrimination, the court by Memorandum Opinion and Order dated August 28, 1996 granted defendant's ("Beinhauer") motion to dismiss claims of wrongful discharge and intentional infliction of emotional distress, and granted former defendant Richard C. Beinhauer's motion to dismiss claims against him individually. Doc. No. 19. The court denied as premature the motion to dismiss as to plaintiff's ("Marsaglia") claims for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, and his claim that he was not notified of his right to continue his health insurance under the Comprehensive Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161, *et seq.* Because of the particular facts of the case Beinhauer had collected and presented evidence which supported summary disposition, but the requirements of Federal Rule of Civil Procedure 12(b)(6) and controlling case law, and the lack of opportunity for Marsaglia to take discovery, dictated that the issues relevant to disability discrimination and COBRA notice could not be decided on a threshold motion.

The parties have now proceeded through discovery. Beinhauer renews its request for summary disposition via a motion under Federal Rule of Civil Procedure 56, which Marsaglia has duly opposed; each party has filed a principal brief, a reply brief, and supporting evidentiary materials. On the merits of the disability discrimination claim, the court acknowledged in its previous memorandum opinion the controlling effect on this case of a then recent Third Circuit decision, *McNemar v. The Disney Store,* 91 F.3d 610 (3d Cir.

1996), *cert. denied,* — U.S. —, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). For the reasons stated below, following *McNemar,* we will grant the motion for summary judgment as to the disability discrimination claim. Summary judgment will also be granted as to Marsaglia's COBRA claim for failure to show a genuine issue of material fact regarding a violation as alleged in the Complaint.

## I. *Facts*

An outline of the relevant facts is contained in the court's August 28, 1996 memorandum opinion, which we will supplement here. Beinhauer operates a series of funeral homes. It hired Marsaglia in September 1983. Marsaglia became a licensed funeral director in 1985, and was assigned to Beinhauer's branch in the Lawrenceville neighborhood of Pittsburgh. He lived there in an apartment Beinhauer owned.

Shortly after his employment began, Marsaglia was involved in an incident in which Beinhauer, through Marsaglia's misidentification of bodies retrieved from the county morgue, cremated the wrong body. More than ten years later in April 1994, Marsaglia began experiencing a skin rash. His dermatologist believed that the rash had been brought on by stress. Marsaglia's treating psychologist later attributed the stress to the 1983 cremation incident.

After calling in sick for two days in May 1994, Marsaglia met with Beinhauer's president, Richard Beinhauer. Marsaglia told Beinhauer that he was seeing a psychiatrist. Plaintiff's Appendix I, Doc. No. 34, Beinhauer Transcript, Tab C at 82.[1] In June 1994, Marsaglia was transferred to Beinhauer's office in Dormont, Pennsylvania, a location with roughly three times the amount of business. *Id.* Tab D at 256. According to Marsaglia, interactions between him and Richard Beinhauer for the next two months ranged between appreciative and critical. When Richard Beinhauer asked Marsaglia in late June or August 1994 if he would continue to be active in the Lawrenceville community, Marsaglia responded that he could not both perform his duties in Dormont and be active in Lawrenceville in his then current physical and mental condition. Compare Tab C, Beinhauer Transcript at 106–07 with Tab A, Marsaglia Transcript, at 99–100. By letter dated August 30, 1994, Richard Beinhauer informed Marsaglia that he would be required to vacate the apartment by September 30, 1994. *Id.* at 100–08.

Around September 5, 1994, Marsaglia complained to the Occupational Safety and Health Administration ("OSHA") about various safety violations he believed were present in the workplace in Dormont. Marsaglia Transcript at 159–66. Around September 6, 1994, Marsaglia filed two complaints with the State Board of Funeral Directors suggesting improprieties with the signing of names on death certificates and the listing of a supervisor at a funeral home. *Id.* at 153–56. In a letter dated September 22, 1994, Marsaglia wrote to OSHA that he was being retaliated against for his earlier complaints about workplace safety violations. *Id.* at 166. OSHA eventually cited Beinhauer for safety violations.

Marsaglia called off sick October 3, 4, and 6, and had a scheduled day off October 5. His depression was the source of his inability to work, though he did not mention this to the Beinhauer staff with whom he spoke when he called in to report his absences. *Id.* at 125–30. He obtained a doctor's excuse for his absences on October 3 and 4 and faxed it to Beinhauer on October 4. Marsaglia also did not report to work on October 7. By letter dated October 7, 1994, Richard Beinhauer terminated Marsaglia's employment for poor performance, falsifying company records, violating safety procedures, failing to vacate the Lawrenceville apartment, and being absent since October 4 without excuse. Doc. No. 34, Beinhauer Transcript, Tab C, Exhibit 6.

Within two weeks Marsaglia sought workers' compensation. In his claim petition, undated[2] and unsworn but signed by Marsaglia

---

1. Citations to transcript passages are intended to include references to the deposition exhibits identified therein and attached to the transcripts.

2. The lawyer's cover letter is dated October 21, 1994.

and his attorney, he claimed that he was fully disabled from "10/3/94 to present." *Id.* Tab A, Exhibit 12. At a hearing on his workers' compensation claim held January 9, 1995, Marsaglia testified under oath as follows upon questioning from his attorney:

Q: Do you feel today, you'd be able if you had a job, to return back to Beinhauer as a Funeral Director?

A: Are you asking, could I return back?

Q: Yes.

A: No, I don't think so. Not at all.

Doc. No. 7, Tab 2 at 27. At another workers' compensation hearing on July 10, 1995, Marsaglia was asked by his attorney, whether he could, at that time, "go back and do the job as a funeral director." Marsaglia responded "No, I do not." *Id.* Tab 3 at 19. At an October 16, 1995 workers' compensation hearing, Marsaglia testified under oath:

Q: Have you returned to work since the last time you testified?

A: No, I haven't.

Q: Are you able to return to work as a funeral director, the job you were performing at the time you were injured?

A: No, I cannot.

Plaintiffs' Appendix II, Doc. No. 35, Tab J at 6. Marsaglia ultimately received $55,467.55 from Beinhauer's insurance carrier in settlement of his workers' compensation claim.

Marsaglia also applied for unemployment compensation. At a January 3, 1995 hearing, Marsaglia testified under oath as follows:

Q: Fine, Mr. Marsaglia, why do you feel you're no longer employed?

A: Well, basic, your Honor, as you will see from everything. [sic] All these accusations of me falsifying reports, company policy manual, everything occurred I [sic] filed a complaint with OSHA. And all my termination is in retaliation of my complaint with OSHA.

. . . .

[Asked for further explanation:]

A: . . . . And it was basically the overall bottom line is that I was terminated because I had filed a complaint with OSHA and the State Board of Funeral Directors, which the company was found in violation and on a fine as well.

[Asked for a summary statement:]

A: Yes, your Honor, again in summary, as you can see I'm sure by the records the timing and the dates is basic retaliation for my filing this complaint to OSHA, why I was terminated October 7, after 12 years of dedicated loyal service.

Doc. No. 7, Tab 4 at 22, 24, 38.

Marsaglia filed an EEOC charge on November 4, 1994. Doc. No. 34, Tab A, Exhibit 5. He checked off the "disability" box in identifying the form of discrimination, but stated under penalty of perjury on the form and swore in an accompanying affidavit that he "did not request or require an accommodation," and "never requested any kind of accommodation." *Id.* and Exhibit 23 ¶ 6.

II. *Summary Judgment Standard*

Summary judgment is mandated where the pleadings and evidence on file show there is no genuine dispute of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). A genuine issue does not arise unless the evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. at 2510. In reviewing any facts alleged to create a genuine issue, if the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. *Matsushita Elec. Ind. Co. v. Ze-*

*nith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

We may not weigh evidence or determine credibility on summary judgment, however, since the process does not lend itself to this type of determination. *Country Floors, Inc. v. Gepner and Ford,* 930 F.2d 1056, 1061–62 (3d Cir.1991). Thus, resolution of issues that involve the parties' intent or state of mind are generally unsuitable for summary judgment. *Young v. Quinlan,* 960 F.2d 351, 360 n. 21 (3d Cir.1992).

## III.  *Discussion*

### A.  *ADA*

■ Much of the documentary evidence against Marsaglia was presented with Beinhauer's motion to dismiss. We examined this evidence and the precedent set by *McNemar* in our August 26, 1996 Memorandum Opinion. At the time, we expressed a belief that *McNemar*[3] controlled our decision as to Marsaglia's disability discrimination claims. We now find that it does.

As we explained in our previous opinion, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As defined by the ADA, a "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

■ It is part of a plaintiff's prima facie case under the ADA to demonstrate that he is qualified for the position he holds or desires. *See, e.g., Olson v. General Electric Astrospace,* 101 F.3d 947, 951 (3d Cir.1996). The Third Circuit in *McNemar* held that a plaintiff may be estopped from claiming in an ADA action that he is qualified for—can perform the essential functions of, with or without accommodation—a position if he has previously represented that he is unable to work, or otherwise cannot perform the duties of his job. "[A] person unable to work is not intended to be, and is not, covered by the ADA." *McNemar,* 91 F.3d at 618. The purpose of applying estoppel in cases such as these is to preserve the integrity of the courts, to prevent claimants from "speak[ing] out of both sides of [their] mouth with equal vigor and credibility" and from "playing fast and loose with the courts by asserting inconsistent positions." *Id.* at 619, 620 (citations omitted).

In his briefs, Marsaglia argues extensively and in detail about Richard Beinhauer's conduct toward him. He asserts that we must view all the facts of the case in the light most favorable to him as the non-moving party, and that a jury could view Beinhauer's conduct as discriminatory, aimed at aggravating his depression and thereby driving him out of his job.

Marsaglia is correct insofar as his arguments go. They do not go far, however, because of the facts of this case and the particular challenge Beinhauer makes. When faced with a summary judgment motion asserting that a plaintiff is not a qualified individual as defined by the ADA, we must examine that question before the case can proceed; his being qualified for the job is an element of his prima facie case, and the burden is always on him to establish his prima facie case when challenged on that basis. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986) (summary judgment appropriate against party which fails to establish existence of element essential to its case on which it bears burden of proof at trial). When the motion further relies on judicial estoppel in seeking to show that the plaintiff is not qualified, in keeping with *McNemar,* we look to what the *plaintiff himself (and those assisting him) have previously represented.* Thus, both the regular requirements of summary judgment analysis in an employ-

---

3. *McNemar,* while still the law of the circuit, has come under close scrutiny and criticism. *See Krouse v. American Sterilizer Co. .,* 126 F.3d 494, 1997 WL 592543, *6 (3d Cir. Sep.26, 1997). We address a portion of this criticism below, and believe we adhere to *Krouse* 's cautions.

ment discrimination case (in examining first whether a prima facie case exists), and the particular requirements of judicial estoppel as applied by *McNemar* (in examining plaintiff's current and former positions for contradictions), dictate that we focus on what the plaintiff has said and done.[4] In this way, we believe we avoid even arguments that disputes of fact exist, since the evidence we examine are documents and statements, many under oath, which we consider at face value for consistency with his current litigating position. Thus, while in the abstract a jury might well find discrimination were it to hear the entirety of evidence, the question is whether a plaintiff is entitled to reach a jury. A worker subject to the baldest form of discrimination, for example, will never see a jury on a Title VII issue if he misses the statutory filing deadline without justification. *See, e.g., Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874, 878 (3d Cir.1990) ("Federal courts lack jurisdiction to hear Title VII claims unless a claim was previously filed with the EEOC.").

In the court's view, Marsaglia never successfully gets beyond the conclusions directly and fairly drawn from his previous representations that he could not perform the essential functions of his funeral director's job even before his October 7, 1994 discharge. He argues in his main brief that there are disputes of material fact regarding his ability to perform the essential functions of the funeral director's job, and whether he requested a reasonable accommodation. In an example of a passage summarizing his assertions, he states:

> [w]hile it is true that many of Richard Beinhauer's actions caused the Plaintiff's condition to worsen and, in fact, the termination probably did cause a temporary inability to work, it does not necessarily follow that the plaintiff was unable to work prior to his termination. If Plaintiff had been granted sick leave as a reasonable accommodation, a jury could well find that he could have continued, as he had since May of 1994, to perform the essential functions of his job.

Doc. No. 33 at 21–22. There are three inconsistencies in this statement, all directly attributable to Marsaglia's representations. First, as cited above, it was Marsaglia himself who stated in his claim petition for workers' compensation that he was disabled on

---

4. On this score, we considered the D.C. Circuit's criticism of *McNemar* in *Swanks v. WMATA*, 116 F.3d 582 (D.C.Cir.1997). *Swanks* collected authority from other circuits, and briefs from the Social Security Administration and the EEOC, which take the position that a person can be disabled for the purposes of the Social Security Act and not be per se disqualified from bringing an ADA claim. *McNemar*'s defect, according to *Swanks*, is that Social Security disability determinations do not account for reasonable accommodation as provided by the ADA.

In taking a closer look at the two decisions, however, in our view the differences are small, and take nothing away from *McNemar*. *Swanks* focuses on reconciling the Social Security Act and its regulations with the ADA and its regulations. The court is persuasive in demonstrating that a disabled Social Security claimant can obtain positive decisions under both statutes.

*McNemar*'s focus was not reconciling abstract statutory text, however. Instead, the court's spotlight was on construing the effects of multiple sworn statements and medical opinions, unvaryingly consistent with each other and inconsistent with the litigation position McNemar had taken. The Third Circuit pointed out early in its decision that one of the two enumerated elements of its form of estoppel was "a recognition that each case must be decided upon its own particular facts and circumstances." 91 F.3d at 617. The court went on to address arguments by amici by emphasizing that protected employment status is not a license to "misrepresent important information," "make false representations with impunity," or "flout the exalted status that the law accords statements made under oath or penalty of perjury." *Id.* at 620.

While evidence of such conduct was plentiful in *McNemar*, the court in *Swanks* noted that it had no evidence of the claimant's position before the Social Security Administration, or even what he said in his application for benefits. 116 F.3d at 587. Moreover, the court conceded a principle in its own circuit that prior sworn statements are given "controlling weight," unless a party can demonstrate why they should not be. *Id.* What name suits this doctrine, if not judicial estoppel? Thus, for the seemingly strong contrary position taken by the D.C. Circuit, *Swanks* is distinguishable on its facts, and, though it would have no effect on this decision, arguably not inconsistent on the law. Even the "individualized inquiry" mandated by the ADA, as interpreted by the EEOC, surely can be satisfied by the collective effect of prior statements and conduct that demonstrate a claimant has taken the position that under no circumstances could he perform the essential functions of his job. *See Krouse*, 126 F.3d 494, 503 n. 4.

October 3, 1994, four days before his discharge. He stated at his deposition that he was unable to work at the time. Doc. No. 34, Tab A at 132. Without questioning the reason for his absences, he in fact did not report for scheduled work from October 3 to October 7, the date of his discharge.

Second, it was Marsaglia who repeatedly testified under oath at workers' compensation hearings that he was unable to return to work as a funeral director. He argues in his brief that we should construe these statements as admitting only that he could not return to work for Beinhauer. Doc. No. 33 at 10–11. This position conflicts with the ADA, which provides that "[t]he term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of *the employment position that such individual holds or desires*," 42 U.S.C. § 12111(8) (emphasis added).

Third, it was Marsaglia himself who stated on his EEOC charge, under penalty of perjury, that he "did not request or require an accommodation. I did ask Mr. Beinhauer about filing for workers compensation to help pay my medical bills in August 1994." Doc. No. 34, Tab A, Marsaglia Deposition Exhibit 5. And it was Marsaglia who testified at his deposition that he did not advise anyone at Beinhauer about the reason he called off sick on October 3, 4, and 6, 1994. *Id.* at 127–28.

The Third Circuit in *Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir.1997) stated that district courts applying *McNemar* should take care that the two conditions of *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996), are present. They are (1) inconsistent positions in the same or a prior proceeding, and (2) bad faith in asserting any of the inconsistent positions. The court in *Ryan Operations* construed this form of bad faith as a party's attempt to play fast and loose with the courts. *Id.*

The inconsistencies are patent as set forth above. Bad faith is demonstrated by same testimony cited above, in which, for example, Marsaglia stated before the workers' compensation board that he could not return to

his former job "at all," ascribed his discharge solely to retaliation before the unemployment compensation review board, and disputes here that he requested an accommodation before his discharge when he swore to the EEOC that he did not. In the four forums before which Marsaglia has sought some form of relief since his discharge, he has directly espoused positions that simply are not compatible. We note that Marsaglia was represented by counsel at his workers' compensation hearings.

Thus, the factual predicates on which Marsaglia's argument above is based are refuted by his own words. Examining these statements of the plaintiff and assigning them the legal weight reasonably attributable to them is consistent with *McNemar*. Because of the form and content of these statements, we find that they are conclusive in showing that he should be estopped from claiming that he was qualified for the position from which he was discharged.

### B. *PHRA*

■ The PHRA, like the ADA, defines "non-job related handicap or disability" as a condition "which does not substantially interfere with the ability to perform the essential functions of the employment which a handicapped person applies for, is engaged in or has been engaged in." 43 P.S. § 954(p). While not bound by federal court interpretations of employment discrimination law in their application of similar Pennsylvania law, Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir.1996). For the reasons stated above, we find that Marsaglia is precluded from pursuing his action under the PHRA as well as the ADA. *See McNemar*, 91 F.3d at 618 (applying corresponding provision under New Jersey law).

### C. *COBRA*

Marsaglia's Complaint states a claim for failure to give notice of COBRA conversion under 29 U.S.C. 1166. Doc. No. 1 ¶ 39. In our August 28, 1996 Memorandum Opinion, we found that COBRA grants this right, but

that we could not properly consider the factual issues surrounding whether notice was provided at that early stage of the litigation. On summary judgment, Beinhauer has taken a different tack in attempting to defeat this claim, perhaps because the proof is simpler. Beinhauer contends that its maximum liability under COBRA would be Marsaglia's medical expenses that would have been covered by his interrupted health insurance ($6,525.61) minus the premiums he would have been obligated to pay ($1,932.49), or the sum of $4,593.12. Since Marsaglia received more than $55,000 in his workers' compensation settlement, far exceeding his medical bills, Beinhauer asserts that Marsaglia fails to state a claim because he has no damages. Marsaglia responds that his receipt of a workers' compensation settlement should not be considered because of the collateral source rule, and that Beinhauer is still responsible for the difference.

Beinhauer in reply points out that all Marsaglia's supporting cases involve torts, seemingly seeking to isolate the collateral source doctrine to tort cases. Doc. No. 37 at 8. We would apply the doctrine to statutory cases when appropriate, however. For example, if out of sympathy a rich relative loaned a discrimination victim the equivalent of her wages while her lawsuit was pending, we would certainly apply the collateral source rule to that situation; such a fortuity should not insulate the discriminator from liability for lost wages. Beinhauer also argues that extra-contractual damages are not available under COBRA, and that damages are limited to the amount necessary to place a plaintiff in the position he would be had coverage been provided, citing only *Gaskell v. Harvard Co-op. Society,* 762 F.Supp. 1539, 1543 (D.Mass.1991), vacated and remanded on other grounds, 3 F.3d 495 (1st Cir.1993). Beinhauer uses this point to support its contention that Marsaglia's medical expenses have already been covered twelve times over from his workers' compensation settlement.

■ Whether the collateral source rule applies in this instance is an interesting question, but one we need not reach. Marsaglia's COBRA claim was based on lack of notice of his right to continuation of benefits. He must raise a fact dispute on this issue to survive summary judgment. As stated in our previous opinion, the few courts that have considered the matter have determined that a good faith effort that is reasonably calculated to reach the employee satisfies COBRA's notice requirement. *See e.g., Williams v. New Castle County,* 970 F.2d 1260, 1265 (3d Cir.1992) (citing congressional conference committee position that notice by first class mail is acceptable); *Campbell v. Emery World Wide,* 1994 WL 519708, 1994 U.S. Dist. LEXIS 13447 (E.D.Pa.1994) (mailing notice within prescribed time period to last known address is satisfies COBRA notice requirement); *Conery v. Bath Associates,* 803 F.Supp. 1388, 1398 (N.D.Ind.1992) (sending notice by first class mail to employee's last known address is sufficient); *Jachim v. KUTV, Inc.,* 783 F.Supp. 1328, 1333 (D.Utah 1992) (employer who prepared notice letter and placed in internal mail fulfilled notice requirement). With its motion to dismiss Beinhauer furnished the declaration of its bookkeeper and corporate secretary describing the company's mailing practices, and stating that on November 10, 1994, she sent to Marsaglia at the last address in her files a letter and notices of his rights to convert his health insurance and life insurance. Doc. No. 7, McCready Declaration ¶¶ 2, 8–10 and Tabs 5–7. We denied the motion to dismiss Marsaglia's COBRA claim to give him "the opportunity to take discovery to determine whether the procedures followed by the Company were in good faith compliance with COBRA." Doc. No. 19 at 18. After taking discovery and submitting two briefs, he has not raised a single fact that challenges Beinhauer's version of its efforts at compliance with COBRA. Finding that these efforts satisfied the statutory notice provision, summary judgment will be granted for Beinhauer on the COBRA claim.

An order consistent with this memorandum opinion will be entered.

### ORDER

In accordance with the accompanying memorandum opinion, defendant's Motion for Summary Judgment, Doc. No. 29, is GRANTED in its entirety.

The Clerk is directed to mark this case closed.